IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 2, 2022

## STATE OF TENNESSEE v. ZACHARY FRANK FARRIS

**Appeal from the Circuit Court for Carroll County**
**No. 20-CR-19      Donald E. Parish, Judge**

_____

### No. W2021-01400-CCA-R3-CD

_____

A Carroll County jury convicted Zachary Frank Farris, Defendant, of six counts of unlawful possession of a firearm by a convicted felon. Following a sentencing hearing, the trial court imposed a total effective sentence of 12 years' confinement. Defendant did not file a motion for new trial. In this direct appeal, Defendant challenges the sufficiency of the evidence, arguing that the State failed to prove that he was in constructive possession of the firearms. Additionally, Defendant asserts that the trial court erred by allowing a witness for the State to testify when the State failed to give defense counsel notice of the witness. Having reviewed the record and the parties' briefs, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., joined. JOHN EVERETT WILLIAMS, P.J., not participating.[1]

Samuel W. Hinson, Lexington, Tennessee, for the appellant, Zachary Frank Farris.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Matthew F. Stowe, District Attorney General; and James Webb, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

---

[1] Judge Williams, the Presiding Judge of the Court of Criminal Appeals, died on September 2, 2022. The members of this panel of the Court acknowledge Judge Williams's steadfast leadership, sharp wit, and overall positive influence on the judiciary during his many years of service to Tennessee. He will be greatly missed by all of his colleagues.

## *Facts*

On July 28, 2019, at 5:55 p.m., the Carroll County Sheriff's Office ("CCSO") dispatch received a call requesting a welfare check on some children who were unattended outside of a residence. Sergeant Michael Smith responded to the residence, a mobile home, and encountered Defendant in the yard. Defendant told Sergeant Smith that the children were going inside the house to take a bath, and Sergeant Smith left the residence.

On August 1, 2019, Deputy Tommy Ducanter responded to another welfare check at the same residence. When he arrived at the residence, he saw "two small children standing in the yard toward the front of the mobile home with no clothes on." Deputy Ducanter did not see an adult outside. The children told Deputy Ducanter that their mother was in bed inside the residence. He followed the children around to the back door and "knocked pretty hard." When no one answered, Deputy Ducanter announced his presence and entered the mobile home. He found Brittany Farris lying in bed. Mrs. Farris admitted that she had been doing methamphetamine, and Deputy Ducanter requested her consent to search the mobile home. Mrs. Farris gave consent to search. Deputy Ducanter saw "a box of syringe[s] with some used liquid or material in it and a little bit of marijuana in plain view." He also saw a rifle leaned against a wall beside the bed. He found two handguns between the mattress and box spring, as well as a box of ammunition. Mrs. Farris told Deputy Ducanter that the rifle was "just a rifle they had at the house" and that she did not know anything about the two handguns under the mattress.

Deputy Ducanter testified that Defendant showed up to the residence, and Deputy Ducanter had a conversation with him in the bedroom. Deputy Ducanter advised Defendant that it was illegal for him to possess any firearms. Defendant stated that he "needed the guns there for home protection and to protect themselves." Defendant told Deputy Ducanter that "he had traded that shotgun off for one of the pistols that was found underneath the bed." Deputy Ducanter observed personal property belonging to Defendant, such as men's clothing, inside the residence.

CCSO Deputy Kenny Tucker arrived at the residence after Deputy Ducanter. Deputy Tucker testified that he heard Defendant tell Deputy Ducanter that he bought the guns for protection. Deputy Tucker testified that he lived "next door to [Defendant]." He testified that he drove past the mobile home every day and had seen Defendant's red Tahoe parked there "mornings and evenings." Deputy Tucker also knew where Defendant's father lived on Crum Road, and he had not seen Defendant's vehicle at Defendant's father's house.

CCSO Deputy Jason Edwards worked as a corrections officer at the Carroll County Jail. He assisted in booking Defendant after his arrest on August 1. The booking report

stated that Defendant's address was the address of the mobile home, but Deputy Edwards did not recall whether that information came from Defendant's driver's license or whether Deputy Edwards asked Defendant for his address.

During a jury break, defense counsel objected to the State's offering the testimony of Child Protective Services ("CPS") investigator Mary Haines because Ms. Haines was not listed on the indictment. Defense counsel acknowledged that Ms. Haines had testified at "the juvenile hearing," but counsel asserted that Ms. Haines "mentioned nothing about being present in the bedroom with law enforcement officers while they were interrogating [Defendant]." Defense counsel argued, "information like that might make a difference on how we proceed forward, whether we decide to do a trial or enter some sort of plea." The State clarified that Ms. Haines would be testifying about a statement that Defendant made directly to her, not to law enforcement. The State also noted that Ms. Haines had previously testified about Defendant's statement to her at the preliminary hearing.

The trial court held a jury-out hearing to allow Defendant to make an offer of proof. Ms. Haines testified that on August 1, 2019, when she arrived at the residence, she spoke to Mrs. Farris, who stated that she had a prescription for suboxone. Mrs. Farris could not find the prescription.

Ms. Haines testified that she observed Defendant's personal belongings inside the home. Upon questioning by the trial court, Ms. Haines stated that she was not a law enforcement officer and that she had no authority to make an arrest.

After Defendant arrived, Ms. Haines testified that she was speaking with Mrs. Farris, "trying to figure out where her prescription [bottle]was." Mrs. Farris thought "maybe [Defendant] had it, so [Mrs. Farris] called him back into the home." Mrs. Farris asked Defendant where her prescription was. According to Ms. Haines, Defendant's response to Mrs. Farris was that he "left that morning with the prescription." Defendant then gave the prescription bottle to Ms. Haines.

The trial court determined that Rule 16 of the Tennessee Rules of Criminal Procedure did not require the State to disclose the substance of Defendant's oral statement to Ms. Haines "because it was not a statement made in response to interrogation by a law enforcement officer." Additionally, the trial court found that Defendant had notice that Ms. Haines would likely testify, as "the witness has long been known to the Defendant as perhaps having information that would be relevant to this matter[.]" The court concluded, therefore, that the State was not required to disclose Ms. Haines as a witness under Tennessee Code Annotated section 40-13-106.

Defense counsel then objected to the admission of Ms. Haines's testimony as cumulative and unduly prejudicial under Rule 403 of the Tennessee Rules of Evidence. Counsel argued that the issue had been addressed "by two officers" and Ms. Haines's role as a DCS investigator would prejudice Defendant. The trial court offered to give the jury a curative instruction but concluded that the testimony was relevant and was not overly cumulative. The trial court cautioned the State to "[s]teer away" from "the child custody-related issue."

After the jury returned, Ms. Haines provided testimony that was substantially similar to her testimony during the offer of proof. Ms. Haines also testified on cross-examination that she had been to Defendant's father's home and did not see any indication that Defendant was living with his father.

Brittany Marie Farris, Defendant's wife, testified on behalf of Defendant. She stated that she and Defendant shared two children. Mrs. Farris testified that the children were removed from her on August 1, 2019, and were still in DCS custody at the time of trial. She testified that on August 1, she and her children lived at the mobile home and Defendant "had started staying with his father because [they] were not getting along." She stated that she and Defendant had been "separated" for "about three, three and a half, weeks" but that Defendant frequently visited the children during that time. Mrs. Farris said that Defendant only took with him his work clothes and personal items and that he left most of his belongings at the mobile home. She testified that she and Defendant reconciled on August 1, out of concern for regaining custody of their children.

Mrs. Farris testified that she inherited the guns found inside her bedroom from her father, who passed away on July 10, 2010, and that she did not know how to operate them. She stated that she had brought them to the mobile home only one week prior to August 1, 2019, and they had been packed away at her grandmother's house until her family sold that house. She stated that the rifle was leaning against a closet door behind a grandfather clock, that one handgun was under the mattress, and that another handgun was hanging in a holster on a hook behind the grandfather clock.

After police arrived, Mrs. Farris texted Defendant to come to the mobile home. Mrs. Farris was aware that Defendant was not legally allowed to possess a firearm. Mrs. Farris heard Defendant tell Ms. Haines that he was not living at the mobile home. Mrs. Farris testified that Defendant had "stopped by" that morning to have breakfast with the children. She stated that Defendant had driven her to the grocery store the night before, and she accidentally left her suboxone prescription in Defendant's vehicle.

Defendant's father, Keith Farris, testified that he lived near Defendant and Mrs. Farris and that Defendant had been sleeping on his couch for "maybe three weeks" prior to August 1.

Defendant testified that he had been staying at his father's house for "[a] little over three weeks" because he and Mrs. Farris had been arguing. He agreed that his father lived nearby to the mobile home, and he testified that he did not remove all of his personal property from the mobile home because he intended to reconcile and move back in with Mrs. Farris. Defendant denied that there were any guns in the mobile home at the time he moved to his father's house. He acknowledged that he had known he could not possess a firearm since his felony conviction in 2015.

Mrs. Farris texted Defendant while he was at work and told him to come to the mobile home. When Defendant arrived, he spoke to Deputy Ducanter in the bedroom. Defendant saw "firearms laid out on the bed, and [he] knew what was going to take place after that." Defendant "just started bawling, crying." He did not tell the officers that he did not live there or that the guns were not his because "[n]obody asked [him]." Defendant testified, "I just got the vibe that they were fixing to charge me with these weapons" because Deputy Tucker asked him for his driver's license. Defendant testified that he "would never have even come to the house if [he]'d known [the guns] were there." Defendant denied having told Deputy Ducanter that he had traded a shotgun for a pistol.

On rebuttal, the State recalled Deputy Ducanter, who testified that he found the two handguns "[b]etween the mattress and the box springs." He testified that Mrs. Farris never told him that she had inherited the guns and that Mrs. Farris was surprised to know that there were guns under the mattress.

### *Analysis*

#### *Testimony of Mary Haines*

Defendant argues that the trial court erred when it failed to exclude Ms. Haines's testimony because Ms. Haines was not listed on the indictment as required by Tennessee Code Annotated section 40-17-106. The State responds that Defendant has waived our review of this issue because he failed to include the issue in a motion for new trial.

The record on appeal does not contain a motion for new trial, a transcript from a motion for new trial hearing, or an order denying a motion for new trial. A failure to file a motion for new trial waives all issues for appellate review other than the sufficiency of the evidence and sentencing. *See* Tenn. R. App. P. 3(e); *State v. Bough*, 152 S.W.3d 453, 460 (Tenn. 2004). Furthermore, Defendant does not ask this Court to conduct a plain error

review nor does he make any argument as to plain error review. It is the defendant's burden to persuade this Court that plain error exists and that the error "was of sufficient magnitude that it probably changed the outcome of the trial." *State v. Hester*, 324 S.W.3d 788, 808 (Tenn. 2010). Thus, we conclude that Defendant has waived our review of this issue and has not demonstrated that review is necessary to do substantial justice or that he was prejudiced.

*Sufficiency of the Evidence*

Defendant challenges the sufficiency of the evidence supporting his convictions, asserting that the State failed to prove that he intended to possess the weapons. The State responds that the evidence was sufficient to support the convictions. We agree with the State.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)). Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)).

The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id*.

As charged in counts one through three, "[a] person commits an offense who unlawfully possesses a firearm" and "[h]as been convicted of a felony crime of violence, an attempt to commit a felony crime of violence, or a felony involving the use of a deadly weapon[.]" T.C.A. § 39-17-1307(b)(1)(A). Aggravated burglary is a crime of violence. *Id*. § 39-17-1301(3). As charged in counts four through six, "[a] person commits an offense who unlawfully possesses a firearm" and "[h]as been convicted of a felony drug offense." *Id*. § 39-17-1307(b)(1)(B). Firearm is defined as "[a]ny weapon that will or is designed to or may readily be converted to expel a projectile by the action of an explosive[.]" *Id*. § 39-11-106(a)(13)(A)(i).

"Possession may be actual or constructive." *State v. Robinson*, 400 S.W.3d 529, 534 (Tenn. 2013) (citing *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001)). Actual possession "refers to physical control over an item." *State v. Fayne*, 451 S.W.3d 362, 370 (Tenn. 2014). On the other hand, constructive possession is established when a person has "'the power and intention at a given time to exercise dominion and control over [an object] either directly or through others.'" *Shaw*, 37 S.W.3d at 903 (quoting *State v. Patterson*, 966 S.W.2d 435, 445 (Tenn. Crim. App. 1997)). In other words, "constructive possession is the ability to reduce an object to actual possession." *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). Constructive possession depends on the totality of the circumstances in each case and may be established through circumstantial evidence. *Robinson*, 400 S.W.3d at 534.

Here, the parties stipulated to Defendant's criminal record, and that on August 1, 2019, it was illegal "under Tennessee law" for Defendant to possess a firearm. The record includes judgments of conviction for aggravated burglary, burglary of a vehicle, and delivery of methamphetamine.

With respect to proof that Defendant constructively possessed the handgun, the State presented testimony at trial that Defendant had been at the mobile home on the morning that a rifle and two handguns, as well as ammunition, were found in the bedroom of the residence. When Deputy Ducanter confronted Defendant about the guns, Defendant told him that "he had traded that shotgun off for one of the pistols that was found underneath the bed[.]" Defendant told Deputy Ducanter that he needed the guns for protection. Deputy Ducanter and Ms. Haines both observed male clothing and personal items belonging to Defendant inside the mobile home. Deputy Tucker had observed Defendant's vehicle parked at the mobile home every day and had not seen it parked at Defendant's father's house. Likewise, Ms. Haines had been at Defendant's father's house and did not see any indication that Defendant lived there.

Defendant's argument that the State "simply failed to present sufficient evidence that [Defendant], although he may have known about the weapons, intended on possessing

them" is a misstatement of the law. While Defendant is correct that the Tennessee Supreme Court has defined constructive possession as having "the power and intention at a given time to exercise dominion and control" over the object, *see Robinson*, 400 S.W.3d at 534, the statute making unlawful possession of a firearm an offense does not require proof of intent. *See* T.C.A. § 39-17-1307(b)(1)(A), (B).

Defendant admitted to having purchased the guns for protection, and he admitted to having been at the residence on the morning the guns were found inside the residence. Despite Defendant's claim that he did not reside at the residence, there was ample evidence at trial to show that Defendant constructively possessed the firearms. In *State v. Thorne Peters*, No. W2018-01328-CCA-R3-CD, 2019 WL 3775872 (Tenn. Crim. App. Aug. 9, 2019), *no perm. app. filed*, a panel of this Court concluded that the evidence was sufficient that the defendant constructively possessed a firearm despite no evidence having been presented that the defendant lived at the residence where the firearm was found or that the defendant owned the firearm. In *Thorne Peters*, the defendant "acknowledged that he knew the gun was in the house[,]" the gun "was located in plain sight, immediately accessible in the front bedroom of the home," and the defendant "told officers they might find his fingerprints on the gun." Defendant is not entitled to relief on this issue.

CONCLUSION

Based on the foregoing, we affirm the judgments of the trial court.

_____
TIMOTHY L. EASTER, JUDGE